DECISION
{¶ 1} Relator, Bonnie Waldron ("relator"), commenced this original action requesting that this court issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order in which the commission denied relator's request for permanent total disability ("PTD") compensation, and to enter an order granting that compensation.
 {¶ 2} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth Appellate District, this matter was referred to a magistrate who issued a decision including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate concluded that the commission abused its discretion and recommended that this court issue a writ of mandamus ordering the commission to vacate its order denying relator's application for PTD compensation, and to enter a new order adjudicating the application in a manner consistent with the magistrate's decision. The commission filed an objection to the magistrate's decision, and relator filed a memorandum opposing the objection. This cause is now before the court for a full review.
 {¶ 3} The basis for the magistrate's recommendation was the magistrate's conclusion that Dr. Zupnick's May 5, 2005, report was ambiguous and therefore was not "some evidence" supporting the commission's decision that, with respect to relator's allowed psychological condition, she is not incapable of sustained remunerative employment.
 {¶ 4} In its objection, the commission argues that the magistrate erred in concluding that Dr. Zupnick's May 5, 2005, report was ambiguous. It maintains that in arriving at this conclusion, the magistrate looked solely at the May 5th report and found the opinion therein to be susceptible of two differing interpretations, but ignored other evidence of record, including Dr. Zupnick's earlier report, which supports the commission's order. More specifically, the commission argues that Dr. Zupnick's November 2004 report constitutes "some evidence" to support the order and that the May 5, 2005 report was written merely for the purpose of clarifying the discrepancy between the occupational assessment form and Dr. Zupnick's November 2004 report, the two of which appear to contain diametrically opposed opinions regarding whether relator is psychologically capable of sustained remunerative employment.
 {¶ 5} In response, relator argues that the magistrate correctly recognized that Dr. Zupnick's ambiguous statement in his May 2005 report, that relator "might" be able to return to work renders both of his other opinions regarding her ability to return to work equivocal. We agree.
 {¶ 6} "* * * [Contradictory or equivocal statements by the same physician cannot, as a matter of law, support an award of compensation."State ex rel. Eberhardt v. Flxible Corp. (1994), 70 Ohio St. 3d 649,656, 640 N.E.2d 815. Thus, equivocal medical opinions are not some evidence. Id. at 657. "* * * [Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement." Ibid. In the present case, Dr. Zupnick's November 2004 opinion that relator is not permanently and totally disabled is not some evidence because it is rendered contradictory or uncertain by the doctor's later statement, in May 2005, that relator "might" be able to return to work. Because this contradiction and uncertainty have never been resolved, the November 2004 report is not some evidence.
 {¶ 7} Further, we agree with the magistrate that the statement that relator "might" be able to return to work is ambiguous and unclarified and thus, pursuant to Eberhardt, the May 2005 report, too, is not evidence. Finally, we agree with the magistrate's conclusion that the December 2004 occupational assessment likewise is not some evidence. Accordingly, we agree with the magistrate's ultimate conclusion that the commission's order in this case is not supported by some evidence and was therefore an abuse of discretion.
 {¶ 8} For all of the foregoing reasons, and after a review of the magistrate's decision and an independent review of the record, as well as due consideration of the commission's objection, we find the magistrate has properly determined the pertinent facts and applied the appropriate law. We, therefore, adopt the magistrate's decision as our own, including the findings of fact and conclusions of law contained therein.
 {¶ 9} Accordingly, the commission's objection to the magistrate's decision is overruled and the requested writ of mandamus is hereby granted.
Objection overruled; writ of mandamus granted.
BROWN and FRENCH, JJ., concur.
 {¶ 10} In this original action, relator, Bonnie Waldron, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 11} 1. Relator has two industrial claims arising from her employment at the Ohio Veterans' Home ("OVH") located at Sandusky, Ohio. Apparently, the OVH is operated by the Ohio Department of Administrative Services ("ODAS").
 {¶ 12} 2. Relator's July 11, 1993 injury occurred while she was cleaning the OVH dining hall. Her left foot slipped on the wet floor and a co-worker caught her right arm to prevent her from falling to the floor. The industrial claim is allowed for "lumbar sprain; lumbar disc herniation at L5-S1; degenerative disc at L4-5; failed interbody fusion L4-5, and degenerative disc disease L5-S1; depressive disorder; right shoulder strain," and is assigned claim number PEL222121.
 {¶ l3} 3. Relator's August 12, 1992 injury occurred at the OVH when relator was pulling out a bed to clean behind it. The industrial claim is allowed for "sprain/strain right hand," and is assigned claim number PEM323471.
 {¶ l4} 4. On October 13, 2004, relator filed an application for PTD compensation.
 {¶ 15} 5. The application prompted the commission to have relator examined by Lawrence A. Kale, M.D., on November 24, 2004. Dr. Kale is board certified in occupational and environmental medicine. Dr. Kale examined for the allowed physical conditions of the two industrial claims. He opined:
 Based solely on the allowed physical conditions from the two claims, it is my medical opinion that the examinee has a sedentary work capacity[.] * * *
 {¶ 16} 6. The application also prompted the commission to have relator examined by clinical psychologist Stanley M. Zupnick, Ph.D., on November 19, 2004. Dr. Zupnick examined relator for depressive disorder. In his six-page narrative report, Dr. Zupnick determined that relator "has a permanent partial impairment of 15% mild impairment."
 {¶ 17} 7. Dr. Zupnick also completed an occupational activity assessment form dated December 6, 2004. The form poses to the examining psychologist the following two-part query:
 Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this injured worker meet the basic mental/behavioral demands required:
 To return to any former position of employment?
 To perform any sustained remunerative employment?
(Emphasis omitted.) By checkmark, Dr. Zupnick responded "no" to both queries on the occupational activity assessment form.
 {¶ 18} 8. On January 28, 2005, an Ohio Bureau of Workers' Compensation claims examiner wrote to Dr. Zupnick:
 You examined the [injured worker], Bonnie Waldron, for the Industrial Commission on 11-29-04 on the issue of Permanent Total Disability. In your report, you gave the [injured worker] a mild, 15% whole person impairment. On the Occupational Activity Assessment page, you said that the [injured worker] could not return to her previous employment and could not perform ANY remunerative employment. We would like to request a clarification.
 What type of psychological impairment would preclude a return to work? For example, would the [injured worker's] ability to concentrate or communicate be compromised? Please, be mindful that if the impairments do not arise from the conditions allowed, the Hearing Officer may not consider same.
(Emphasis sic.)
 {¶ 19} 9. In response to the January 28, 2005 claims examiner's letter, Dr. Zupnick authored an addendum on May 5, 2005, stating:
 This is a brief addendum to the report concerning Mrs. Waldron which was submitted to you on 11/29/04. You asked that I clarify the issue of not being able to perform any type of sustained remunerative employment.
 In reviewing my information, I note that I was in effect basing my decision based upon her total allowed conditions both from a psychological and a physical point of view. Furthermore, I was basing it on the fact that she has not performed any type of work since December, 1993. However, when taking into account only her allowed condition of a Depressive Disorder, NEC, it would be my conclusion that she Mrs. Waldron would be able to return to some form of employment; although, her ability to handle sustained concentration might impede the level of employment. She might be able to work on a part-time basis, at least in the beginning. Therefore, in response to your specific question, it is concluded based only on her psychological condition that she could perform some form of sustained remunerative employment.
(Emphasis sic.)
 {¶ 20} 10. Following an October 25, 2005 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order explains:
 This order is based upon the 11/24/2004 report of Dr. Kale, the 5/5/2005 report of Dr. Zupnick, and an evaluation of the injured worker's non-medical disability factors.
 On 11/24/2004 Dr. Kale evaluated the injured worker for the allowed physical conditions of both claims. It was his opinion that all the allowed physical conditions had reached maximum medical improvement; that the allowed condition of PEM323471, a right hand sprain/strain, presented a zero percent permanent partial impairment; that the allowed physical conditions of PEL222121 presented a thirteen percent permanent partial impairment; and that the allowed physical conditions resulted in a residual functional capacity for sedentary work.
 Sedentary work means:
 Exerting up to ten pounds of force occasionally (occasionally: activity or condition exists up to one-third of the time) and/or a negligible amount of force frequently (frequently: activity or condition exists from one-third to two-thirds of the time) to lift, carry, push, pull or otherwise move objects. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.
 The opinion of Dr. Kale is found persuasive.
 The allowed psychological condition of depressive disorder was evaluated by Dr. Zupnick on 11/19/2004. It was his opinion, when considering only the allowed psychological condition, that the injured worker could perform some type of employment and was impeded only by the injured worker's ability to handle sustained concentration. Dr. Zupnick recommended that the injured worker gradually return to work, starting with part-time work and eventually returning to full-time work. Dr. Zupnick's opinion as indicated in his 5/5/2005 report is found persuasive.
 The injured worker testified at hearing that she sees Dr. Stratton monthly for her depressive disorder and takes Effexor. No current assessment from Dr. Stratton is presently in file.
 As the medical evidence is not dispositive of the permanent total disability determination, an evaluation of the non-medical disability factors is necessary. State ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St. 3d 167.
 The injured worker is presently 53 years of age. This is found to be a vocationally neutral factor. While some employers prefer younger workers with more work-life remaining over the course of employment, other employers prefer more mature employees with past work and life experiences.
 The injured worker completed the 10th grade in school. The injured worker indicated she left school during the 11th grade when she ran away due to family problems. It was the injured worker's testimony that she was an "average student" and that she did not terminate her education due to difficulty in school. The injured worker testified at hearing that she did do some work toward obtaining a G.E.D., but did not complete this work or obtain a G.E.D. The injured worker further indicated that she has not received any special training or vocational education.
 The injured worker's IC-2 application and her testimony at hearing confirmed that the injured worker can read, write, and do basic math. The foregoing establishes that the injured worker has a "limited education" which means the injured worker has an ability in reasoning, arithmetic, and language skills for unskilled work. Generally, an education from the seventh through the eleventh grade is considered a limited education and does not qualify the injured worker to do the complex duties of semi-skilled or skilled work.
 This educational profile is consistent with the injured worker's strong work history. The IC-2 application indicates the injured worker performed factory work at her first job. While the IC-2 does not list dates for this work the injured worker's history to Dr. Zupnick reflects this occurred at approximately age 18 or 1960.
 The injured worker's application reflects a long history of unskilled employment: private home house cleaning for another employer, private home house cleaning on a self-employed basis, kitchen cook, deli clerk, kitchen worker in the Ohio Veteran's Home, and custodial work for the Ohio Veteran's Home.
 The injured worker's past jobs are all of an exertional level which exceed her sedentary residual functional capacity. The allowed conditions of claim number PEL222121, therefore, preclude the injured worker's return to work at any of her former positions of employment. However, the injured worker has not explored sedentary work possibilities.
 The injured worker was initially referred to rehabilitation on 4/19/1995 and began physical therapy to restore strength and range of motion. A functional capacity evaluation performed on 8/1/1995 demonstrated symptom magnification and reflected the injured worker was not giving her maximum effort. It was recommended that the injured worker begin work conditioning for two weeks and work hardening for four to six weeks.
 It does not appear the injured worker completed these recommendations. Living maintenance payments were terminated on 8/13/1995 without explanation. The injured worker's rehabilitation file was officially closed on 1/26/1996 indicating the injured worker was not ready to be involved in rehabilitation at that time.
 A second referral was made for rehabilitation on 5/11/2001. The injured worker completed an interview on 6/5/2001 and indicated at that time she did not feel she was capable of work due to her physical condition. The injured worker at that time was six weeks post gastric bypass surgery. The injured worker's physician of record, J.C. Mariotti, D.C., indicated the injured worker was permanently and totally disabled and the second rehabilitation file was closed on 6/21/2001. No further attempts at rehabilitation have occurred.
 The medical evidence has established that the injured worker is capable of sedentary level work. Psychologically, the injured worker needs to engage in a gradual return to work due to concentration difficulties. However, her psychological condition is not work prohibitive. The injured worker's work history has demonstrated the ability to engage in unskilled work. Despite these positive factors the injured worker has failed to fully participate in any physical rehabilitation efforts and has not explored any vocational rehabilitation options.
 The injured worker's residual functional capacity combined with her ability to read, write, and do basic math demonstrate she can engage in entry-level sedentary jobs. The injured worker's education level and work history indicate she is capable of on-the-job training. Therefore, the injured worker is found to be capable of sustained remunerative employment.
 Based on the above listed physical capacities and non-medical disability factors, this Hearing Officer finds that the injured worker's disability is not total, and that the injured worker is capable of engaging in sustained remunerative employment, or being retrained to engage in sustained remunerative employment. Therefore, the injured worker's request for an award of Permanent Total Disability benefits is denied.
 {¶ 21} 11. On January 17, 2006, relator, Bonnie Waldron, filed this mandamus action.
Conclusions of Law:
 {¶ 22} The issue is whether Dr. Zupnick's May 5, 2005 report, upon which the commission relied, constitutes some evidence to support the commission's medical finding that relator can perform sustained remunerative employment.
 {¶ 23} Finding that Dr. Zupnick's May 5, 2005 report does not constitute some evidence upon which the commission can rely, it is the magistrate's decision that this court issue a writ of mandamus, as more fully explained below.
 {¶ 24} Equivocal medical opinions are not evidence. State ex rel.Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649, 655. Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id. Ambiguous statements, however, are considered equivocal only while they are unclarified. Id. The Eberhardt court, at 657, further explains ambiguous statements:
 * * * [A]mbiguous statements are inherently different from those that are repudiated, contradictory or uncertain. Repudiated, contradictory or uncertain statements reveal that the doctor is not sure what he means and, therefore, they are inherently unreliable. Such statements relate to the doctor's position on a critical issue. Ambiguous statements, however, merely reveal that the doctor did not effectively convey what he meant and, therefore, they are not inherently unreliable. Such statements do not relate to the doctor's position, but to his communication skills. * * *
 {¶ 25} Here, the commission, through its SHO, declared: "Dr. Zupnick recommended that the injured worker gradually return to work, starting with part-time work and eventually returning to full-time work."
 {¶ 26} Apparently, the above-noted declaration from the SHO's order was the commission's interpretation of Dr. Zupnick's statement "[s]he might be able to work on a part-time basis, at least in the beginning."
 {¶ 27} According to relator, the commission's declaration of what Dr. Zupnick's May 5, 2005 report says is not supported by the language in Dr. Zupnick's report. That is, relator claims that Dr. Zupnick's May 5, 2005 report provides no evidence to support the commission's declaration of what Dr. Zupnick stated in that report. (Relator's brief, at 6.)
 {¶ 28} In the magistrate's view, Dr. Zupnick's May 5, 2005 report is ambiguous as to whether relator is medically able to perform sustained remunerative employment. The ambiguity is created when Dr. Zupnick states "[s]he might be able to work on a part-time basis, at least in the beginning." (Emphasis added.) That statement is subject to two different interpretations.
 {¶ 29} One interpretation is that Dr. Zupnick is expressing uncertainty as to relator's medical ability to work on a part-time basis at least in the beginning. That interpretation is entirely inconsistent with Dr. Zupnick's earlier expression that relator "would be able to return to some form of employment."
 {¶ 30} The other interpretation is that Dr. Zupnick was recommending that relator begin with part-time work followed by his gratuitous speculation as to the availability of part-time work. That is the interpretation that the commission chose to give to Dr. Zupnick's statement.
 {¶ 31} Given that Dr. Zupnick's statement is ambiguous, as the above analysis shows, the ambiguity remains unresolved. Dr. Zupnick has not been asked to clarify what he meant when he wrote "[s]he might be able to work on a part-time basis, at least in the beginning."
 {¶ 32} Reliance upon Dr. Zupnick's report was an abuse of discretion. Dr. Zupnick's May 5, 2005 report must be removed from evidentiary consideration. See State ex rel. Malinowski v. Hordis Bros., Inc.
(1997), 79 Ohio St.3d 342. (Dr. Brown's report was found to be problematic because it was subject to different interpretations.)
 {¶ 33} Removal of Dr. Zupnick's May 5, 2005 report does not, however, imply that Dr. Zupnick's occupational activity assessment is revived. The commission cannot ignore that Dr. Zupnick repudiated his occupational activity assessment. Accordingly, both the occupational activity assessment and the May 5, 2005 addendum must be removed from evidentiary consideration.
 {¶ 34} Accordingly, it is the magistrate's decision that this court issue a writ of mandamus ordering the commission to vacate its SHO's order of October 25, 2005 denying relator's PTD application, and, in a manner consistent with this magistrate's decision, enter a new order that adjudicates the PTD application.