{¶ 1} Relator, David Bury, has filed this original action requesting that this court issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission"), to vacate its order denying his application for permanent total disability ("PTD") compensation and to issue an order granting said compensation, or, in the alternative, to issue a new order that gives adequate consideration to the evidence.
 {¶ 2} Pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court, who examined the evidence and issued a decision containing findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate determined that the commission did not abuse its discretion in denying relator's application for PTD compensation, as the commission cited "some evidence" to support its decision. Accordingly, the magistrate recommended that this court deny the requested writ of mandamus. No party has filed objections to the magistrate's decision.
 {¶ 3} Upon an examination of the magistrate's decision and an independent review of the file, this court finds no error of law or fact present in the magistrate's decision. Accordingly, this court adopts the magistrate's decision as its own and denies relator's request for a writ of mandamus.
Writ denied.
LAZARUS and BROWN, JJ., concur.
 APPENDIX A DECISION IN MANDAMUS {¶ 4} Relator, David Bury, filed this original action in mandamus asking the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying compensation for permanent total disability ("PTD") and to issue an order granting the requested compensation or, in the alternative, that gives adequate consideration to the evidence.
 {¶ 5} Findings of Fact:
 {¶ 6} 1. In 1988, David Bury ("claimant") sustained an industrial injury, and his workers' compensation claim was allowed for back strain, herniated discs and depressive disorder.
 {¶ 7} 2. The parties agree that, in October 1999, claimant was examined by Gordon Zellers, M.D. (This report does not appear in the evidence filed in mandamus.)
 {¶ 8} 3. In October 1999, claimant was also examined by Walter Belay, Ph.D., who found that claimant was using a cane and having difficulties with ambulation. Speech was logical and coherent. Claimant was well oriented and there were no apparent deficits in attention or concentration. Memory and abstract thinking were intact. There was no perceptual dysfunction. Claimant was capable of explaining proverbs, generating similarities and noting differences, and performing mental computational tasks. Dr. Belay found no evidence that claimant was under the influence of any drugs. Dr. Belay concluded that the allowed condition did not prevent the claimant from returning to his former position of employment.
 {¶ 9} 4. In November 1999, claimant filed a PTD application.
 {¶ 10} 5. In January 2000, Dr. Zellers provided a supplemental report, addressing PTD questions. He accepted the information on the application, including that claimant required narcotic analgesics to perform activities of daily living, could perform only limited care for himself, had pain that required him to spend the majority of his time lying down, and that he had problems with sitting, standing, and mental activities.
 {¶ 11} Dr. Zellers opined that claimant could not engage in prolonged standing or walking. He restricted claimant to sedentary activities that would permit him to lie down as needed and opined that claimant should not be permitted to function in a work environment while under the influence of sedative-type medications "should those medications pose a threat to his safety." He concluded that, as claimant would probably continue to need the high doses of narcotic pain medication, claimant was unable to perform sustained remunerative employment.
 {¶ 12} 6. In January 2000, Dr. Belay also provided a supplemental report, reviewing the additional medical reports provided by claimant and rendering an opinion on PTD. Dr. Belay accepted that claimant experienced some impairment from depression but opined that, based on the treatment notes and his own examination, claimant was not impaired from gainful employment.
 {¶ 13} 7. On several occasions, the employer obtained videotape of claimant's activities, showing him riding a motorcycle, walking without his cane, carrying things, driving a truck, etc. The videotape was provided to the court in two consecutive videocassettes.
 {¶ 14} 8. According to a file review by Jon Starr, M.D., a specialist in pain control, claimant began treatment in 1997 with Dr. Chevlen, who prescribed Oxycontin and Oxycodone. Dr. Chevlen's records indicated that, as claimant continued to complain of pain, the doctor increased the doses and later added a prescription for morphine. Dr. Starr discussed claimant's medical history and treatment in detail, and also discussed comparative pain management for conditions such as acute trauma, cancer pain, and chronic pain. Dr. Starr concluded:
 {¶ 15} "Based on the evidence on file, and accepting the findings of the treating and examining physicians and the legally allowed conditions in this claim, it is medically reasonable to conclude that[:]
 {¶ 16} "1. This patient has had ongoing subjective complaints of low back and/or right lower extremity pain for greater than 10 years[.]
 {¶ 17} "2. None of the treatment provided during that time has had any significant impact on the patient's proclaimed pain and/or functional capabilities, and specifically, in spite of going from 5-6 Percocet per day to over 2 grams of morphine per day, the patient has claimed no change in either his pain or his functional capabilities[.]
 {¶ 18} "3. More important, it appears that somewhere over the past 10 years this patient has chosen to pursue the security of a legal disability role as preferable to assuming the challenges of reintegration to the adult world of responsibilities.
 {¶ 19} "Further, by my review, and in my opinion, the services provided by Drs. Chevlen and DiMarzio since 1997 have:
 {¶ 20} "A. served only to support this choice, adding a massive load of fuel to the patient's perspective of the severity of his disability, with goals aimed only at subjective symptoms;
 {¶ 21} "B. have been of NO lasting benefit to the patient [and this is documented by the patient's repeated allegations at formal exam as well as by the treating physician's and psychologist's own statement].
 {¶ 22} "When the above treatment is compounded with the observed capabilities demonstrated by the patient in July 2000, one is also forced to conclude that further treatment such as has been provided by Drs. Chevlen and DiMarzio is * * * a waste of time and money * * *.
 {¶ 23} "* * *
 {¶ 24} "* * * [T]he employer might consider referring this case to the Medical Board for review, since the issue of inappropriate prescribing of controlled substances [as opposed to the payment for the same] ultimately is reserved to their review." (Emphasis sic.)
 {¶ 25} 9. Dr. Zellers was asked to view the videotape and provide a medical opinion. In a February 2001 report, Dr. Zellers described the videotape as showing claimant:
 {¶ 26} "* * * [C]limbing into and driving a large truck, easily standing up from a chair without apparent difficulty, walking with a stable gait without the assistance of a cane, performing prolonged standing and ambulatory activities without evidence of an antalgic gait, performing forward flexion activities of up to 80 degrees, carrying groceries and the patient was observed riding/driving a motorcycle. * * *"
 {¶ 27} Dr. Zellers stated that the activities were "quite physically demanding and * * * entirely inconsistent with the patient's previously documented subjective limitations."
 {¶ 28} Dr. Zellers concluded that claimant was "far more physically functional than suggested by his previous subject complaints and in-office physical examination findings." Based on the demonstration of physical functioning shown on the videotape, he opined that claimant's allowed conditions did not in and of themselves preclude him from sustaining remunerative employment. In addition, Dr. Zellers stated that the activities he saw on the tape made him question the use of narcotics.
 {¶ 29} 10. In July 2001, claimant was examined by Dr. Zellers in regard to whether narcotic medication should be terminated. The leg-raising test was negative on the left and slightly positive on the right. Claimant showed less strength in the right lower extremity. Sensory testing showed a decrease in sensation of the right calf. Dr. Zellers observed reflex asymmetry, loss of range of motion, and an antalgic gait. Claimant's urine tested positive for morphine. Dr. Zellers reported that, after surgeries, injections and physical therapy, claimant was still reporting persistent pain. He stated that the complaints of pain were consistent with the examination. Dr. Zellers then discussed whether prescriptions for morphine should be terminated, and he concluded that the diagnoses and physical compromise justified ongoing prescriptions for narcotic medication. He stated that the history of herniated discs reflected pathology that can be responsible for long-term complaints of pain. Dr. Zellers opined that, based on claimant's persistent complaints, the examination, medical records reporting chronic pain, and lack of any further therapies to offer, claimant's continued use of narcotic pain medications was justified.
 {¶ 30} 11. In November 2001, Dr. Zellers provided an additional report, addressing the question of physical capacities and restrictions. In this report, however, he referenced the videotape. Dr. Zellers stated that the videotape showed claimant walking with a normal gait, carrying a child, engaging in prolonged standing, and driving a truck. He also noted the narrative report of the investigator, describing numerous physical activities. In regard to physical capacities, Dr. Zellers then concluded: "CONCLUSION: Upon taking into consideration the surveillance videotape and narrative made reference to above, it becomes apparent that the patient's current physical capabilities exceed those reported and/or demonstrated by the patient at the time of my most recent examination on July 31, 2001 (report dated August 20, 2001)."
 {¶ 31} Dr. Zellers then set forth a list of physical capacities, stating that claimant was restricted to sedentary to light duty activities, lifting no more than occasional 20 pounds. He opined that claimant could walk or stand for a total, combined, of two hours. He stated that claimant could sit for an hour at a time and would need to change his position intermittently. He prohibited bending, squatting, climbing, and repetitive activities involving the right leg or foot. He reiterated that, "should" the narcotic medications pose a threat to safety in a work environment, claimant could not be permitted to function in that environment under the influence of narcotics.
 {¶ 32} In regard to the videotape, Dr. Zellers also noted that claimant was seen operating a motor vehicle but was reported taking extremely high doses of narcotics, "which would render him incapable of safely operating his vehicle." Dr. Zellers stated that "if" claimant was "truly operating his motor vehicle under the influence" of high doses of narcotics, claimant's conduct was a danger to himself and others. However, he opined further that, if, on the other hand, claimant was not under the influence of narcotics while performing the driving activities, then his activities would serve to show that he is capable of functioning in a work environment without the aid of controlled substances.
 {¶ 33} Dr. Zellers further explained the contradiction, stating that high doses of narcotics such as reportedly used by claimant would typically preclude an individual from functioning in any work environment but that claimant's "observed activities" on the videotape would indicate that, despite the use of these medications, claimant was nonetheless capable of performing sustained remunerative activities in a "sedentary to limited light duty setting."
 {¶ 34} 12. Other medical reports were filed, including reports from Drs. Hoover, DeRosa, Belay, DePizzo and Raghavan, and vocational reports were also submitted.
 {¶ 35} 13. In November 2001, a staff hearing officer heard the PTD application and issued an order denying compensation:
 {¶ 36} "This order is based upon the reports of Drs. Zellers, Belay and the vocational assessment of Mr. Shane.
 {¶ 37} "Per claimant's counsel, claimant is unable to attend today's hearing as he had to fly to Arizona to take care of his brother who is ill. * * *
 {¶ 38} "The employer submitted an investigation report and videotaped surveillance of the claimant. The surveillance of this claimant is extensive in that it involves various time periods, per the investigation report. Claimant was surveilled on the following dates: July 13, 2000, July 23, 2000, July 30, 2000, October 11, 2000, October 12, 2000, August 16, 2001, and September 2, 2001. The activities in the videotape shown at hearing document the claimant driving a truck, ambulating normally without a cane, carrying groceries, performing prolonged standing and ambulatory activities, carrying a small child, and driving a motorcycle.
 {¶ 39} "* * * The claimant was not present at hearing to address any incon-sistencies in his daily activities given to examining physicians from that of the activities on the surveillance tapes.
 {¶ 40} "The Staff Hearing Officer relies upon the medical reports of Drs. Zellers and Belay and find[s] these opinions are well-supported.
 {¶ 41} "Dr. Belay, per report dated October 12, 1999, examined claimant and issued an opinion with respect to claimant's psychological condition. Dr. Belay concludes the allowed condition of depressive disorder does not prevent the claimant from returning to his former position of employment. The Staff Hearing Officer finds Dr. Belay's conclusion is supported by his examination findings and the claimant's psychological condition does not prevent him from returning to his former position of employment as a customer service agent.
 {¶ 42} "The Staff Hearing Officer also relies upon the * * * report from Dr. Zellers concerning claimant's physical conditions. Dr. Zellers examined claimant on July 31, 2001 and also had the opportunity to review the surveillance videotape. Dr. Zellers found claimant capable of sedentary to light duty activities. He indicated claimant can lift twenty pounds on an occasional basis. Dr. Zellers opined claimant could perform sedentary work if he was permitted to change body positions intermittently.
 {¶ 43} "As Dr. Zellers indicated claimant is unable to return to his former position of employment, an analysis of the non-medical disability factors is appropriate to determine if claimant can perform work consistent with Dr. Zellers' physical restrictions.
 {¶ 44} "After reviewing claimant's age, education, and work experience, the Staff Hearing Officer concludes claimant retains the ability to perform sedentary work. The Staff Hearing Officer also relies upon the vocational analysis of Mr. Shane filed April 11, 2001.
 {¶ 45} "Claimant is forty-eight years of age and is classified as a younger individual. The age of forty-eight provides claimant ample time to engage in a re-training course or on-the-job training. Mr. Shane finds claimant's age would not present a barrier to re-employment. The Staff Hearing Officer concludes claimant's age is a positive factor to obtaining entry-level sedentary work.
 {¶ 46} "Likewise, claimant's education level is a positive factor. Claimant is a high school graduate. The Staff Hearing Officer notes some of the evidence in file, particularly the report of Dr. Belay, indicates the claimant attended college. The claimant's IC-2 Application indicates claimant is a high school graduate and there is no mention of college. Again, claimant was not present at the hearing to clarify the issue. Looking at the evidence in the most favorable light to the claimant, the Staff Hearing Officer makes the finding the claimant has twelve years of formal education. * * * This evidences claimant's mental acumen to perform the tasks associated with entry-level sedentary work. Mr. Shane also indicates, based upon claimant's education, claimant could develop the skills necessary for entry-level sedentary work. * * *
 {¶ 47} "The claimant's work experience is also a positive factor. Claimant has worked a variety of jobs including: sales clerk, retail stock clerk, campground laborer, highway maintenance worker, steel tester, courier, and customer service agent. Claimant completed vocational questionnaires and outlined the job duties associated with many of these jobs. Claimant's most recent jobs are courier (1979-1989) and customer service agent (1993-1996). As a courier, claimant indicated he drove a van to deliver and pick up packages. He also read a map, looked up zip codes and prepared delivery records per the questionnaire from the claimant. Claimant also worked as a customer service agent for Fed Ex. This job required him to take packages over the counter and route the packages. Claimant answered phones, used the computer for e-mail and posting, researched zip codes, and counted out money, per the questionnaire. Mr. Shane characterizes claimant's job as a customer service agent as semi-skilled. Mr. Shane found numerous sedentary jobs claimant could perform based upon the claimant's demonstrated skills. He concludes claimant's work history should present no barriers, especially because it shows a good deal of job stability.
 {¶ 48} "The Staff Hearing Officer relies upon Mr. Shane's opinion and finds, based upon claimant's young age of forty-eight years, education level of a high school graduate and claimant's successful performance of various semi-skilled jobs, the claimant retains the ability to perform entry-level sedentary work. As such, claimant's disability is not total and the application for Permanent Total Disability benefits is denied."
 {¶ 49} 14. A request for reconsideration was denied.
 {¶ 50} Conclusions of Law:
_¶ 51_ Claimant argues that the commission abused its discretion in denying PTD compensation because Dr. Zellers' reports were contradictory and could not constitute some evidence on which the commission could rely, and because, even his reports were acceptable, the commission's reliance on him required a finding of PTD because he opined that the sedative effect of prescription medications precluded employment.
 {¶ 52} The magistrate finds that claimant has not met his burden of proof. Although Dr. Zellers changed his opinion from January 2000 (that claimant was unable to perform sustained remunerative employment due to the high doses of narcotics) to February 2001 (that, based on the activities observed on the videotape, claimant's allowed conditions did not in and of themselves preclude him from sustaining remunerative employment), he explained the reasons that prompted the change. Cf. State ex rel. Taylor v. Indus. Comm. (1995), 71 Ohio St.3d 582; State ex rel. Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649; State ex rel. Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445.
 {¶ 53} Dr. Zellers explained that he had based his former opinion on claimant's presentation during the examination and reported limitations, including a reported dependence on high doses of sedatives/narcotics. He explained that the activities on the videotape changed his opinion because it showed claimant performing activities inconsistent with his reported limitations, symptoms and sedation.
 {¶ 54} Next, the magistrate acknowledges that, in the report of August 2001 (based on the examination of July 2001), Dr. Zellers appeared to accept claimant's reported symptoms. In that report, basing his opinion solely on the July 2001 examination and claimant's medical records, and omitting consideration of the videotape, Dr. Zellers concluded that continued prescriptions for high narcotics were justified. He stated that claimant's subjective complaints were consistent with his presentation during the examination. The issue before Dr. Zellers was whether the prescriptions for narcotics should stop, and Dr. Zellers opined that the medical file and the presentation in the examination, together with the lack of therapeutic alternatives, justified continued prescriptions for narcotics. However, it is important to note that Dr. Zellers, in this report, did not address claimant's physical capacities, nor did he address the videotaped activities. Although he stated that the reported complaints were consistent with claimant's presentation during the exam and with the history, he offered no opinion as to whether the reported complaints and narcotics use were consistent with the videotaped activities.
 {¶ 55} Subsequently, Dr. Zellers filed a supplemental report, including consideration of the videotaped activities and clarifying his opinions. In that report of November 2001, he reviewed his findings in the July 2001 examination, and essentially concluded that he could not reconcile claimant's presentation during examination with claimant's activities on the videotape.
 {¶ 56} The magistrate finds no fatal defect in the November 2001 report that would bar it from evidentiary consideration. Dr. Zellers was confronted with a contradiction between claimant's conduct during the exam and his activities on the tape when engaging in daily life and had no reason to believe that his activities were being observed. Unlike the situations in the cases cited by claimant, Dr. Zellers was trying to account for an inconsistency presented by claimant. His inability to explain claimant's inconsistent actions certainly does not mean that his report must be barred from evidentiary consideration.
 {¶ 57} In each of his reports, Dr. Zellers simply reported what he observed at that time, whether in examination or on a tape, explaining what each observation meant medically. He ultimately provided, in the November 2001 report, a thorough discussion of the inconsistencies in claimant's presentations. His discussion was reasonable. Dr. Zellers explained that the heavy doses of narcotics, if taken, would preclude successful operation of the motor vehicles, which appears to be a completely logical conclusion. Although he had, in the past, found claimant to be credible in his statements regarding his limitations and his need for heavy doses of narcotics, the tape provided contradictory evidence. When Dr. Zellers saw the tape, he could not know with certainty whether (a) claimant was not taking the narcotics and could therefore ride motorcycles and drive trucks, etc.; or (b) claimant was able to perform this wide variety of physical activities despite his use of narcotics medication. In any event, Dr. Zellers gave a medical assess-ment of the taped activities, and he stated that these activities showed claimant performing a greater range of activities than he had demonstrated upon examination and in his recitation of symptoms and limitations. Further, based on the tape, Dr. Zellers set forth a description of claimant's physical restrictions and capacities.
 {¶ 58} These restrictions and capacities listed by Dr. Zellers are consistent with what he viewed on the videotape. In other words, his November 2001 assessment regarding claimant's physical capacities does not contradict the physical activities shown plainly on the tape. It is true that there is a difference between Dr. Zellers' assessment of the tape and his prior description upon examination, but it is fair to say that the contradiction was presented by the claimant, and it would be unjust to expect Dr. Zellers to know the exact truth. On the videotape, claimant's gait, his walking, his carrying, his driving a motorcycle, were not consistent with the limitations he described and exhibited to the doctor. In his attempt to explain claimant's activities on the tape, Dr. Zellers essentially stated that claimant's activities did not make sense — that if one accepted that claimant's pain was bad enough to need heavy doses of narcotics and if one accepted claimant's reports of his severe limitations of daily life, then one cannot reconcile the activities seen on the tape. That assessment was reasonable.
 {¶ 59} Further, Dr. Zellers' caution in refraining from stating his views is understandable. If he stated that it appeared claimant could perform activities such as driving a motorcycle while using heavy doses of narcotics, he was in danger of being held responsible if claimant was in a motor vehicle accident. If he said claimant was apparently not using the heavy doses, he was venturing into an area of which he lacked definite clinical evidence. However, it was clear from the tape that, for whichever reason, this claimant was able to perform a broad variety of activities that he had said he could not do.
 {¶ 60} Moreover, the topics addressed in the August 2001 report and the November 2001 report were not the same. In August 2001, Dr. Zellers was focusing on termination of prescriptions for narcotics, which is a different matter from the issue addressed in November 2001, which was claimant's capacity to perform physical activities. In regard to treatment and therapy, he was not willing to cut off the narcotic prescriptions. In contrast, when discussing the physical activities that claimant could perform, he relied on the activities that he saw claimant actually perform on the tape.
 {¶ 61} Dr. Zellers' reports, considered in combination, show that, when he relied solely on claimant's presentation in person, he found claimant believable and based his opinion on that, but when he included consideration of the taped activities, he found the portrayal of claimant's actual activities to be compelling. That is not a fatal contradiction that strips a medical report of evidentiary value.
 {¶ 62} Next, the magistrate addresses the issue of whether the commission's reasoning constituted an abuse of discretion. In its order, the commission stated that it relied on the opinion of Dr. Zellers that included consideration of the videotape. Claimant argues, however, that the commission failed to resolve the questions raised in Dr. Zellers' report of November 2001.
 {¶ 63} The magistrate disagrees. The commission's reliance on Dr. Zellers' opinion regarding physical capacities and restrictions was reasonable. Given the activities shown on the tape, it was reasonable for Dr. Zellers to conclude that claimant could perform the listed activities. Also, it was reasonable for the commission to adopt Dr. Zellers' list of restrictions, given its own viewing of the tape.
 {¶ 64} Contrary to claimant's argument, Dr. Zellers did not state in his final report that claimant's use of narcotics prevented him from engaging in sustained remunerative employment. Rather, he stated a set of physical capacities and then cautioned that, "should" the use of medication cause his presence in a certain environment to be unsafe, claimant could not function in that environment. Thus, he indicated that some environments could be unsafe if and when claimant was impaired by heavy use of narcotics. Moreover, the commission repeatedly expressed that it was unable to assess claimant's side of the story because he did not appear at the hearing. Claimant was not present at the hearing to help the hearing officer resolve the inconsistencies between his presentation to doctors and his activities on the tape. The tape, however, was viewed during the hearing, and it is clear from the commission's decision that it chose to rely more heavily on the tape than on claimant's reports of pain and impairment, which was within its discretion. State ex rel. Pass v. C.S.T. Extraction Co. (1996),74 Ohio St.3d 373.
 {¶ 65} The magistrate concludes that the commission cited "some evidence" to support its decision. Based on the record as a whole, the magistrate finds no abuse of discretion. Claimant has not met his burden of proof in mandamus, and the magistrate recommends that the court deny the requested writ of mandamus.